**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Matthew BULLOCK, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 8, 2004.

Filed Jan. 14, 2005.

Reargument Denied March 18, 2005.

Albert J. Flora, Jr., Wilkes–Barre, for appellant.

David W. Lupas, Asst. Dist. Atty., Wilkes–Barre, for Com., appellee.

BEFORE: BENDER, PANELLA and MONTEMURO * JJ.

OPINION BY MONTEMURO, J.:

¶ 1 This case presents an issue of first impression challenging the constitutionality of Pennsylvania's fetal homicide statute, the Crimes Against the Unborn Child Act, 18 Pa.C.S.A. § 2601 *et seq.* For the reasons set forth below, we affirm.

¶ 2 On January 6, 2003, Appellant Matthew Bullock, accompanied by his father, arrived at the Wilkes–Barre City Police Department and informed the officer at the front window that he had strangled his girlfriend, Lisa Hargrave, at his apartment, and gave police a key to the residence. Officers discovered the decomposed body of Ms. Hargrave in a bedroom closet. Her hands, feet, and mouth were bound with 2″ wide masking tape. At the time of her death, Ms. Hargrave was 22 to 23 weeks pregnant. Following an autopsy, the coroner determined Ms. Hargrave's cause of death to be strangulation by history,[1] and the male fetus' cause of death to be "[a]sphyxia due to the death of the mother by homicide." (N.T., 10/20/03, at 148). In both cases, the coroner listed the manner of death as homicide.

¶ 3 While the search of his apartment was being conducted, Appellant gave an oral and written statement to police detailing the circumstances surrounding the

* Retired Justice assigned to Superior Court.

1. Strangulation by history refers to the events immediately preceding the death, described *infra*. This diagnosis necessarily relies upon facts provided by Appellant in his statement to police.

death of Ms. Hargrave. He told them that he and Ms. Hargrave consumed alcohol and cocaine at a party on New Year's Eve, and then returned to the apartment, where they argued about Ms. Hargrave's excessive drug use. Appellant maintained that at some point he blacked out, and then awoke to find himself on top of Ms. Hargrave strangling her to a point where she almost lost consciousness. Because he was fearful that she might call the police, Appellant wrapped her hands and feet with masking tape, and left the room. When he could still hear her yelling and struggling to break free, he returned, taped her mouth shut, and then left the room again. Appellant stated that he could still hear her breathing heavily and struggling to break free. Therefore, he returned to the bedroom once more, and strangled her until she stopped breathing. When Ms. Hargrave began to turn cold, he panicked and dragged her body into the closet.

¶ 4 Appellant was subsequently charged with the murders of both Ms. Hargrave and her unborn child.[2] Appellant filed two pretrial motions, one challenging the constitutionality of the Crimes Against the Unborn Child Act, and the other seeking suppression of his statements to police. On September 4, 2003, less than three weeks before trial was scheduled to begin, Appellant also filed a Notice of Claim of Mental Infirmity, which the Commonwealth sought to strike as untimely. Following a hearing, the trial court denied Appellant's pretrial motions and the Commonwealth's motion to strike. On October 28, 2003, a jury returned a verdict of guilty but mentally ill of third degree murder in the death of Lisa Hargrave, and guilty but mentally ill of voluntary manslaughter in the death of the unborn child. On November 17, 2003, Appellant was sentenced to

15 to 40 years' imprisonment for the murder, and a consecutive 5 to 20 year term for the voluntary manslaughter. Appellant's timely post sentence motions were denied by Order dated February 10, 2004, and this appeal followed.

¶ 5 Appellant raises four issues on appeal challenging (1) the constitutionality of the Crimes Against the Unborn Child Act, 18 Pa.C.S.A. § 2601 et seq.; (2) the trial court's jury instruction for the crime of voluntary manslaughter of an unborn child; (3) the Commonwealth's failure to prove the corpus delicti of the crimes charged; and (4) the aggregate sentence of 20 to 60 years' imprisonment. For the reasons set forth below, we affirm.

¶ 6 Appellant's primary issue is his constitutional challenge to the Commonwealth's fetal homicide statute. Enacted in October of 1997, the Crimes Against the Unborn Child Act, 18 Pa.C.S.A. § 2601 et seq., extends criminal liability for the murder, voluntary manslaughter, or aggravated assault of an unborn child. Appellant contends, however, that the Act violates substantive due process because it is vague and overbroad, and equal protection because it exempts female perpetrators. We disagree.

¶ 7 When reviewing the constitutionality of a statute, we begin with the "strong presumption that legislative enactments do not violate the constitution." Commonwealth v. MacPherson, 561 Pa. 571, 752 A.2d 384, 388 (2000). Thus, the challenger of the Act bears a heavy burden of proving that the statute "clearly, palpably and plainly violates constitutional rights." Id. (internal quotations omitted).

¶ 8 Appellant was convicted of voluntary manslaughter of an unborn child, 18 Pa.C.S.A § 2605(a)(1).

2. It is undisputed that Appellant knew Ms. Hargrave was pregnant when he killed her.

A person who kills an unborn child without lawful justification commits voluntary manslaughter of an unborn child if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: ... the mother of the unborn child whom the actor endeavors to kill, but he negligently or accidentally causes the death of the unborn child[.]

*Id.*[3] In defining "unborn child," the statute refers to the meaning given that term in the Abortion Control Act, 18 Pa.C.S.A. § 3201 *et seq.*, as "an individual of the species homo sapiens from fertilization until live birth." *Id.* at § 3203. Appellant's first constitutional challenge focuses on this definition. He argues that because the Act fails to include a viability element, it is unconstitutionally vague as no jury would be able to determine when the act of the defendant caused the death of the unborn child.

¶ 9 When considering a void for vagueness challenge, we focus on the conduct prohibited by the statute, which must be explained with " 'sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *Commonwealth v. Mikulan,* 504 Pa. 244, 470 A.2d 1339, 1342 (1983) (quoting *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). Here, it is clear that the legislature intended to protect unborn children from the moment of fertilization.

The viability of the fetus, that is, its likelihood of survival outside of the mother's body, is irrelevant. Indeed, viability, in a broader sense, becomes important only in determining whether it was the act of the defendant which caused the death of the unborn child rather than some other factor. As our Supreme Court noted in *Commonwealth v. Booth,* 564 Pa. 228, 766 A.2d 843, 850 (2001), "[t]oday it is understood that a mother and her unborn child are separate and distinct entities, and that medicine is generally able to prove the corpus delicti of the homicide of an unborn child." (internal citations omitted). As always, the burden of proving beyond a reasonable doubt this causation element is on the Commonwealth. Clearly, a death occurs when the embryo or fetus no longer has the capacity to thrive or grow. *See* Webster's New Collegiate Dictionary 289 (8th ed.1981) (defining death as "a permanent cessation of all vital functions."). When an act of the defendant has caused the death, he may be held criminally liable.[4] Therefore, Appellant's void for vagueness challenge fails.

¶ 10 Appellant raises a second, related due process claim, arguing that the statute is overbroad because "a person could be held criminally liable for causing the destruction of a non-living organism." (Appellant's Brief at 17). Citing the United States Supreme Court decisions in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Planned Parenthood v. Casey,* 505 U.S. 833, 112 S.Ct.

---

3. The statute provides three specific exemptions from criminal liability:

    (1) For acts committed during any abortion or attempted abortion, whether lawful or unlawful, in which the pregnant woman cooperated or consented.

    (2) For the consensual or good faith performance of medical practice, including medical procedures, diagnostic testing or therapeutic treatment, the use of an intra-uterine device or birth control pill to inhibit or prevent ovulation, fertilization or the implantation of a fertilized ovum within the uterus.

    (3) Upon the pregnant woman in regard to crimes against her unborn child.

18 Pa.C.S.A. § 2608(a)(1)-(3).

4. It is undeniable that prosecutions for these crimes will rely heavily on medical evidence.

2791, 120 L.Ed.2d 674 (1992), Appellant contends that human life does not exist unless an organism is "living;" because the statute fails to define what constitutes a "living" organism, it is overbroad.

¶ 11 Appellant's reliance on *Roe* and *Casey* is misplaced. Although the *Roe* Court held that a state has a legitimate interest in protecting a fetus from the time of viability such that it may regulate abortions, it also held that the state "has still *another* important and legitimate interest in protecting the potentiality of human life." *Roe, supra* at 162, 93 S.Ct. 705 (emphasis original). The *Casey* Court reaffirmed "the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." *Casey, supra* at 846, 112 S.Ct. 2791. As the Court further explained,

> The woman's liberty [to have some freedom to terminate her pregnancy] is not so unlimited ... that from the outset the State cannot show its concern for the life of the unborn, and at a later point in fetal development the State's interest in life has sufficient force so that the right of the woman to terminate the pregnancy can be restricted.

*Id.* at 869, 112 S.Ct. 2791.

¶ 12 The Act *sub judice* imposes criminal liability only on those who, without legal justification, cause the death of an unborn child. Therefore, if it can be proven through medical evidence that the embryo or fetus was not "living" prior to the precipitating act, the defendant cannot be held criminally liable. Accordingly, we find that the statute comports with the requirements of due process.

¶ 13 In *State v. Merrill*, 450 N.W.2d 318 (Minn.1990), *cert. denied*, 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990), a virtually identical issue was raised before the Supreme Court of Minnesota with respect to that state's fetal homicide statute. The appellant had been indicted for first and second degree murder in the death of both Gail Anderson and her 28–day old embryo. The state's fetal homicide statute imposes criminal liability on a person who, *inter alia*, "causes the death of an unborn child with premeditation and with intent to effect the death of the unborn child or another[.]" *Id.* at 321 n. 1 (quoting Minn. Stat. § 609.2661).[5] Similar to the law at issue here, the Minnesota statute defines "unborn child" as "'the unborn offspring of a human being conceived, but not yet born.'" *Id.* at 320–21 (quoting Minn.Stat. § 609.266(a)). In rejecting a due process challenge, the Minnesota Supreme Court held that the statute sufficiently defined the prohibited conduct.

> The state must prove only that the implanted embryo or the fetus in the mother's womb was living, that it had life, and that it has life no longer. To have life, as that term is commonly understood, means to have the property of all living things to grow, to become. It is not necessary to prove, nor does the statute require, that the living organism in the womb in its embryonic or fetal state be considered a person or a human being. People are free to differ or abstain on the profound philosophical and moral questions of whether an embryo is a human being, or on whether or at what stage the embryo or fetus is ensouled or acquires "personhood". These questions are entirely irrelevant to criminal liability under the statute. Criminal liability here requires only that the genetically

---

5. As here, the statute exempts pregnant women from liability, Minn.Stat. § 609.266, as well as all acts committed during a consensual abortion. *Id.* at § 609.269.

human embryo be a living organism that is growing into a human being. Death occurs when the embryo is no longer living, when it ceases to have the properties of life.

*Id.* at 324. We find the same to be true here. *See also State v. Alfieri,* 132 Ohio App.3d 69, 724 N.E.2d 477, 483 (1998) (rejecting due process challenge to fetal homicide statute that assigns criminal liability to one who causes death of unborn child as "a result of injuries inflicted during the period that begins with fertilization and that continues unless and until live birth occurs.") (emphasis omitted).

¶ 14 Appellant's second constitutional challenge rests upon the equal protection clause. Specifically, he contends that "the language of the provisions effectively imposes criminal sanctions only on males and exempts females who are similarly situated." (Appellant's Brief at 18). This argument is both factually and legally unsound.

¶ 15 "The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly." *Curtis v. Kline,* 542 Pa. 249, 666 A.2d 265, 267 (1995). However, the principle "does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, ... and does not require equal treatment of people having different needs." *Id.* (citations omitted). Indeed, the Commonwealth may create legislative classifications so long as the classifications "rest upon some ground of difference which justifies the classification and [have] a fair and substantial relationship to the object of the legislation." *Id.* at 268.

¶ 16 Once a classification is challenged, our standard of review depends upon the type of classification at issue. If the classification implicates a suspect class or fundamental right, we subject the statute to strict scrutiny, and will find it to be valid only if "necessary to the achievement of a compelling state interest." *Commonwealth v. Bell,* 512 Pa. 334, 516 A.2d 1172, 1178 (1986). If the classification implicates an important though not fundamental right, we must determine whether the classification serves "an important governmental interest and [is] substantially related to the achievement of that objective." *Id.* Finally, the third type of classification, that which implicates neither a suspect class nor a fundamental or important right, "will be valid as long as [it is] rationally related to a legitimate governmental interest." *Id.*

¶ 17 Contrary to Appellant's mischaracterization, the Act does not exempt all women from criminal liability. Rather, § 2608(a)(3) exempts pregnant women from criminal liability "in regard to crimes against **her** unborn child." (emphasis added). Nevertheless, Appellant contends that this classification is subject to strict scrutiny because it implicates his fundamental liberty interest in being free from confinement, and that a pregnant woman's right to privacy "is not a compelling reason for the state to excuse a mother who perpetrates a crime against her unborn child[.]" (Appellant's Brief at 18).

¶ 18 Appellant has applied the wrong standard of review to this classification. First, one cannot reasonably argue that men and pregnant women are similarly situated. Second, a classification is subject to strict scrutiny only when it involves a suspect class (not relevant here) or implicates a fundamental right. Here, the right implicated by the classification is not, as Appellant suggests, the right to be free from confinement; rather, it is the right to harm an unborn child. Indeed, Appellant cannot claim any right, fundamental or otherwise, to harm a pregnant woman's

unborn child. We find, with no hesitation, that the Act is rationally related to the government's legitimate interest in protecting "the potentiality of human life." *Roe, supra* at 162, 93 S.Ct. 705. Accordingly, Appellant's equal protection claim fails.

■■■■ ¶ 19 Next, Appellant argues that the trial court's jury instructions on the crime of voluntary manslaughter of an unborn child were inadequate.

In reviewing a challenged jury instruction, an appellate court must consider the entire charge as a whole, not merely isolated fragments, in order to ascertain whether the instruction fairly conveys the legal principles at issue.

*Commonwealth v. Gibson,* 553 Pa. 648, 720 A.2d 473, 481 (1998), *cert. denied,* 528 U.S. 852, 120 S.Ct. 132, 145 L.Ed.2d 111 (1999). "The trial court may phrase its instructions as it chooses, provided the law is clearly, adequately, and accurately presented to the jury." *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 321 (2002). " 'An erroneous jury charge warrants the grant of a new trial unless the reviewing court is convinced beyond a reasonable doubt that the error is harmless.' " *Commonwealth v. Ketterer,* 725 A.2d 801, 805 (Pa.Super.1999) (quoting *Commonwealth v. Nichols,* 692 A.2d 181, 186 (Pa.Super.1997) (citations omitted)).

¶ 20 As noted *supra,* Section 2605(a)(1) involves the killing of an unborn child "negligently or accidentally" by a person acting under "a sudden and intense passion resulting from serious provocation" by the mother of the unborn child. 18 Pa. C.S.A. § 2605(a)(1). Appellant claims that the trial court erred when it refused to instruct the jury on the meaning of the mens rea elements of the crime, that is, "negligently" or "accidentally" causing the death of the unborn child. In addition, Appellant contends that the court failed to

instruct the jury that to convict him, they must find that he had a specific intent to kill the mother of the unborn child.

¶ 21 The trial court instructed the jury as follows:

Voluntary manslaughter of the unborn child as my earlier definitions of malice indicate there can be no malice when certain reducing circumstances are present. When these circumstances are present a killing may be voluntary manslaughter of the unborn child but never murder. This is true when the Defendant kills in the heat of passion following serious provocation. Accordingly, you can find murder and malice only if you are satisfied beyond a reasonable doubt that the Defendant was not acting under a sudden an intense passion resulting from serious provocation by the mother of the unborn child whom the Defendant was trying to kill when he negligently or accidentally causes the death of the unborn child.

\* \* \*

Remember, you can find malice in murder only if you are satisfied beyond a reasonable doubt that the Defendant was not acting under a sudden and intense passion resulting from serious provocation by the mother of the unborn child whom the Defendant was trying to kill when he negligently or accidentally causes the death of the unborn child. If you do not find that the Defendant had malice and committed the murder, you may find him guilty of voluntary manslaughter of the unborn child as long as you are satisfied that the following three elements have been proven beyond a reasonable doubt; first, that the unborn child is dead. Second, that the Defendant killed it. And, third, that the Defendant had the intent to kill the mother of the unborn child.

(N.T., 10/20/03, 905–07). When ruling on Appellant's objection to its failure to define the terms "negligently" and "accidentally," the trial court stated "[w]e find [these terms] common or ordinary that the jury could understand without further definition[.]" *Id.* at 911.

¶ 22 We find no reversible error. Negligence, as defined in the Crimes Code, involves more than the ordinary negligence required in tort cases. *Ketterer, supra* at 807. Indeed, the absence of a charge on this element is grounds for reversal. *Id.* However, here, the crime also includes a lesser culpability requirement; a person may be convicted of voluntary manslaughter of an unborn child if he **accidentally** causes the death of the unborn child. Although the term "accidental" is not defined in the Crimes Code, its common meaning is:

> **1** : arising from extrinsic causes … **2 a:** occurring unexpectedly or by chance **b:** happening without intent or through carelessness and often with unfortunate results

Webster's New Collegiate Dictionary 7 (8th ed.1981). *See* 1 Pa.C.S.A. § 1903(a) (in statutory construction, "[w]ords and phrases shall be construed … according to their common and approved usage …"). Thus, the death of an unborn child could be considered "accidental" if the perpetrator was not aware the mother was pregnant, or if he intended, in some way, to save the unborn child while attempting to kill the mother. Regardless, we find the court's failure to define the term harmless.[6]

¶ 23 It is undisputed that Appellant knew Ms. Hargrave was pregnant at the time he strangled her, and that he did nothing to save the unborn child. Even under the statutory definition of negligence, we find that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Appellant was "aware of a substantial and unjustifiable risk that [the death of the fetus] will result from his conduct … [and that the] risk was of such a nature and degree that [Appellant's] failure to perceive it, considering the nature and intent of his conduct (strangling Ms. Hargrave) and the circumstances known to him, (*i.e.,* the fact that she was pregnant) involves a gross deviation from the standard of care that a reasonable person would observe in [Appellant's] situation." 18 Pa.C.S.A. § 302(b)(4). Thus, he is entitled to no relief.[7]

¶ 24 Appellant also claims that the trial court erred in failing to instruct the jury that to convict him of the crime they must find that he had the specific intent to kill the mother of the unborn child. The

---

**6.** We note that the crime at issue here mirrors the language in the voluntary manslaughter statute: "A person who kills without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by … another whom the actor endeavors to kill, but he **negligently or accidentally** causes the death of the individual killed." 18 Pa.C.S.A. § 2503(a)(2) (emphasis added).

**7.** Appellant also raises a constitutional vagueness challenge based on the undefined element "accidentally." However, as discussed *supra,* we find that the term is not vague, either in the abstract, or as applied to Appellant. *See Commonwealth v. Adamo,* 431 Pa.Super. 529, 637 A.2d 302, 306 (1994), *appeal denied,* 538 Pa. 631, 647 A.2d 507 (1994), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994) (statute containing no ascertainable standard of conduct subject to facial vagueness challenge; when statute contains ascertainable standard of conduct and does not infringe on first amendment rights, vagueness issue must be determined with reference to conduct of person challenging statute).

statute imposes criminal liability upon a person who negligently or accidentally causes the death of an unborn child "if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by ... the mother of the unborn child whom the actor **endeavors to kill**[.]" 18 Pa.C.S.A. § 2605(a)(1) (emphasis added). Appellant asserts, and we agree, that the term "endeavors to kill" is synonymous with a criminal attempt to cause the death of the mother, a crime that requires a specific intent to kill. *See Commonwealth v. Mason*, 474 Pa. 308, 378 A.2d 807 (1977). Here, however, the trial judge properly instructed the jury that to convict Appellant of voluntary manslaughter of an unborn child they must conclude beyond a reasonable doubt "that the Defendant had the intent to kill the mother of the unborn child." (N.T., 10/20/03, 907). Therefore, Appellant is entitled to no relief.

¶ 25 In his third claim, Appellant argues that the Commonwealth failed to prove beyond a reasonable doubt the *corpus delicti* of the crimes of which he was convicted. He contends that application of the rule is critical in this case since he was "severely mentally ill at the time he made the statement to police, which served as the sole basis for the medical examiners (sic) findings[.]" (Appellant's Brief at 19).

¶ 26 The *corpus delicti* rule was created to "prevent the use of hasty and unguarded confessions to convict an individual when no crime has been committed." *Commonwealth v. Ahlborn*, 441 Pa.Super. 296, 657 A.2d 518, 521 (1995), *appeal denied*, 547 Pa. 713, 688 A.2d 170 (1995).

Establishing the *corpus delicti* in Pennsylvania is a two-step process. The first step concerns the trial judge's *admission* of the accused's statements and the second step concerns the fact finder's *consideration* of those statements. In order for the statement to be admitted, the Commonwealth must prove the *corpus delicti* by a preponderance of the evidence. In order for the statement to be considered by the fact finder, the Commonwealth must establish the *corpus delicti* beyond a reasonable doubt.

*Commonwealth v. Rivera*, 828 A.2d 1094, 1104 n. 10 (Pa.Super.2003), *appeal denied*, 577 Pa. 672, 842 A.2d 406 (2004) (emphasis original) (citing *Commonwealth v. Reyes*, 545 Pa. 374, 681 A.2d 724 (1996), *cert. denied*, 520 U.S. 1174, 117 S.Ct. 1445, 137 L.Ed.2d 551 (1997)). "In a homicide prosecution, '[t]he corpus delicti consists of proof that a human being is dead and that such death took place under circumstances which indicate criminal means or the commission of a felonious act[.]'" *Commonwealth v. McMullen*, 745 A.2d 683, 687–88 (Pa.Super.2000), *appeal denied*, 563 Pa. 700, 761 A.2d 549 (2000) (quoting *Commonwealth v. Frazier*, 411 Pa. 195, 191 A.2d 369, 373 (1963)). Finally, we note that the *corpus delicti* may be proven through circumstantial evidence, *Rivera*, *supra* at 1104, and that the criminal responsibility of the accused is not a requirement of the rule. *Ahlborn*, *supra* at 521.

¶ 27 Accordingly, before Appellant's statements to police could be considered by the jury, the Commonwealth was required to prove beyond a reasonable doubt that Ms. Hargrave and her unborn child were dead, and that their deaths were the result of criminal means. We have no hesitation in concluding that the Commonwealth met this burden. Ms. Hargrave's decomposed body was found behind a closed closet door in her bedroom. The officer who discovered the body described the scene as follows:

[The body was] very slightly in the back of the closet and in my experience it was very decomposed.... Her clothing was

disheveled in that the pants were somewhat down and the shirt was somewhat up.... After she was taken out of the closet, further inspection indicated that her hands had been taped numerous times together in front of her, her legs had been taped together numerous time—it appeared to be numerous time[s], and her face had been taped.

(N.T., 10/20/03, at 54–55). The coroner, who performed the autopsies on both Ms. Hargrave and her fetus, explained that Ms. Hargrave's hands, feet and mouth were "tightly bound with two inch wide masking tape." (*Id.* at 137). He testified that although there was no physical evidence that Ms. Hargrave was strangled, he also found no evidence that she died from natural causes or a drug overdose. (*Id.* at 140–42). Moreover, he explained that physical evidence of strangulation is not always found in strangulation cases. (*Id.* at 144). With respect to the fetus, the coroner testified that there was no evidence that the fetus died before the mother; therefore, he listed the cause of death as asphyxia due to the death of the mother. (*Id.* at 147–48).

¶ 28 Although the coroner admitted on cross-examination that he could not determine the manner of Ms. Hargrave's death based solely on the autopsy (*id.* at 151), we find that the Commonwealth established beyond a reasonable doubt that Ms. Hargrave and her unborn child died as a result of criminal means. It would have been impossible for Ms. Hargrave to "tightly" bind her own hands, feet and mouth. Therefore, the manner in which the body was discovered, *i.e.*, bound with masking tape, decomposed, and behind a closed closet door, coupled with the coroner's determination that Ms. Hargrave did not die from natural causes, clearly demonstrate that Ms. Hargrave, and her fetus, were the victims of foul play. The jury could then consider Appellant's confession in determining whether he was indeed the culprit.

¶ 29 In his final issue, Appellant challenges the discretionary aspects of his sentence. Specifically, he argues that the "sentence failed to reflect the significant mitigating evidence of the history of [Appellant's] serious mental illness and the jury's finding of guilty but mentally ill[,]" and that the sentencing judge incorrectly concluded "that two human lives were lost." (Appellant's Brief at 21).

¶ 30 Appellant's claim involves the discretionary aspects of his sentence, and, therefore, is not appealable as of right. Rather, Appellant must petition this Court for allowance of appeal and demonstrate that a substantial question exists as to whether the sentence imposed is inappropriate under the Sentencing Code. 42 Pa. C.S.A. § 9781(b). Although each sentence must be evaluated on an individual basis, generally we will find a substantial question exists, and grant the appeal, " 'only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code or (2) contrary to the fundamental norms which underlie the sentencing process.' " *Commonwealth v. Sierra*, 752 A.2d 910, 913 (Pa.Super.2000) (quoting *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super.1999) (*en banc*), *appeal denied*, 567 Pa. 755, 790 A.2d 1013 (2001)).

¶ 31 In order to satisfy the requirements of § 9781(b), Pennsylvania Rule of Appellate Procedure 2119(f) mandates that an appellant challenging the discretionary aspects of his sentence set forth in his brief a concise statement of the reasons relied upon for allowance of appeal. Pa.R.A.P. 2119(f); *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987). Before reaching the merits of an

appellant's argument, we must review the appellant's Rule 2119(f) statement to determine whether he has presented a substantial question for our review. *Commonwealth v. Goggins*, 748 A.2d 721, 726 (Pa.Super.2000) (*en banc*), *appeal denied*, 563 Pa. 672, 759 A.2d 920 (2000). A Rule 2119(f) statement that simply "contains incantations of statutory provisions and pronouncements of conclusions of law" is inadequate. *Commonwealth v. Martin*, 727 A.2d 1136, 1143 (Pa.Super.1999), *appeal denied*, 560 Pa. 722, 745 A.2d 1220 (1999).

> Rather, only where the appellant's Rule 2119(f) statement sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process, will such a statement be deemed adequate to raise a substantial question so as to permit a grant of allowance of appeal of the discretionary aspects of the sentence.

*Commonwealth v. Mouzon*, 571 Pa. 419, 812 A.2d 617, 627 (2002).

¶ 32 Limiting our review to Appellant's Rule 2119(f) statement, we conclude that Appellant has failed to raise a substantial question. Nowhere in his four sentence Rule 2119(f) Statement does he explain what specific provision of the sentencing code or fundamental norm underlying the sentencing process has been violated. Indeed, this Court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review. *Commonwealth v. Wellor*, 731 A.2d 152 (Pa.Super.1999); *Commonwealth v. Bershad*, 693 A.2d 1303 (Pa.Super.1997); *Commonwealth v. Urrutia*, 439 Pa.Super. 227, 653 A.2d 706 (1995), *appeal denied*, 541 Pa. 625, 661 A.2d 873 (1995).

¶ 33 Moreover, Appellant's second claim is an exercise in semantics. He argues that the court erred in concluding that two human lives were lost when only "[o]ne human life ... and an **organism** of the species homo sapiens were lost." (Appellant's Brief at 22) (emphasis original). As we discussed *supra*, the Commonwealth has an important and legitimate interest in protecting the potentiality of human life from the moment of conception until live birth. Appellant's consecutive 5 to 20 year sentence for the death of his unborn child reflects his blatant disregard for that potential life. Thus, we decline to review his sentencing claims.

¶ 34 Judgment of sentence affirmed.