913 A.2d 207

COMMONWEALTH of Pennsylvania, Appellee,

v.

Matthew BULLOCK, Appellant.

Supreme Court of Pennsylvania.

Argued Oct. 18, 2006.

Decided Dec. 27, 2006.

484

Basil G. Russin, Esq., Public Defender's Office, Albert Joseph Flora, Jr., Esq., Wilkes–Barre, for Matthew Bullock.

David W. Lupas, Esq., Scott C. Gartley, Esq., Luzerne County District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## OPINION

Justice SAYLOR.

This case primarily concerns the constitutionality of Pennsylvania's fetal homicide statute; it additionally entails a challenge to jury instructions given at Appellant's trial, where he was convicted of voluntary manslaughter of an unborn child.

## I.

In the late 1990s, Pennsylvania's General Assembly enacted the Crimes Against the Unborn Child Act.[1] The Act added Chapter 26 to the Pennsylvania Crimes Code, which created several new offenses designed to protect unborn children from unlawful injury or death. Under the Act, an individual commits criminal homicide of an unborn child if he or she intentionally, knowingly, recklessly, or negligently causes the death of an unborn child, see 18 Pa.C.S. § 2603, a term that refers to

1. Act of October 2, 1997, P.L. 379, No. 44, effective March 31, 1998 (as amended, 18 Pa.C.S. §§ 2601–2609).

the fetus at any stage of gestation. *See* 18 Pa.C.S. § 2602.[2] Accordingly, the Act establishes the crimes of first, second, and third degree murder of an unborn child, as well as voluntary manslaughter and aggravated assault of an unborn child. *See* 18 Pa.C.S. §§ 2604–2606. Its criminal provisions do not apply, however, to consensual abortion, doctors engaged in good faith medical practice, or pregnant women in regard to crimes against their own unborn children. *See* 18 Pa.C.S. § 2608(a). Of particular relevance to this appeal are the Act's specifications with regard to voluntary manslaughter:

> **(a) Offense defined.**—A person who kills an unborn child without lawful justification commits voluntary manslaughter of an unborn child if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) the mother of the unborn child whom the actor endeavors to kill, but he negligently or accidentally causes the death of the unborn child. . . .
>
> \* \* \* \* \* \*
>
> **(c) Penalty.**—The penalty for voluntary manslaughter of an unborn child shall be the same as the penalty for voluntary manslaughter.

18 Pa.C.S. § 2605.

## II.

In late 2002, Appellant was living with his girlfriend, Lisa Hargrave, who was 22 to 23 weeks pregnant. According to Appellant's statement to police, on New Year's Eve 2002, he and Hargrave consumed alcohol and cocaine at a party and then returned to their apartment, where Hargrave continued to ingest cocaine. Appellant asked Hargrave to cease using drugs for the remainder of the night in view of her pregnancy. When Hargrave failed to comply, an argument ensued, during

---

**2.** Section 2602 provides this definition by reference to the Abortion Control Act, 18 Pa.C.S. §§ 3201–3220. *See* 18 Pa.C.S. § 3203 (defining both "unborn child" and "fetus" as "an individual organism of the species homo sapiens from fertilization until live birth").

which Appellant "blacked out." When he awoke, he found himself on top of Hargrave strangling her so that she was almost unconscious. Because he feared Hargrave would call the police, he wrapped her feet and hands with masking tape and left the room. When he could hear her yelling and attempting to free herself, he returned, taped her mouth shut, and left the room again. After Hargrave continued to struggle to break free, Appellant returned to the bedroom once more and strangled her until she stopped breathing. He then dragged her body into the closet.

On January 6, 2003, Appellant arrived at the Wilkes–Barre Police Department and informed an officer that he had strangled his girlfriend to death. When the police arrived at the apartment, they found Hargrave's partially decomposed body in the closet with her hands, feet, and mouth bound with masking tape. Appellant was charged with the murder of Hargrave, see 18 Pa.C.S. § 2501(a), and, pursuant to the Act, with the criminal homicide of her unborn child as well. He filed a pre-trial motion challenging the constitutionality of the Act on, *inter alia*, due process and equal protection grounds; this motion was denied. The matter then proceeded to trial by jury in October 2003, at which Appellant did not testify.

At trial, the coroner stated that, after performing autopsies of Hargrave and her unborn child, he concluded that Hargrave's cause of death was "strangulation by history," which refers to the events immediately preceding the death, see N.T. October 20, 2003, at 142–44; this conclusion was apparently based, in part, upon the occurrences as related by Appellant in his statement to police. The coroner also found that the fetus's death was caused by "asphyxia due to the death of the mother by homicide." *Id.* at 148. In both cases, the coroner determined that the manner of death was homicide.

Before deliberations began, Appellant objected to the trial court's refusal to charge the jury on the *mens rea* elements "negligently" and "accidentally" found in the voluntary manslaughter provision of the Crimes Against the Unborn Child Act (*see supra*). The trial court overruled the objection, however, opting to allow the jury to use the "common and

ordinary understanding" of the terms. *Id.* at 911. The jury found Appellant guilty-but-mentally-ill of third degree murder as to Hargrave, and guilty-but-mentally-ill of voluntary manslaughter of an unborn child. Appellant was sentenced to consecutive terms of imprisonment of fifteen to forty years for the murder of Hargrave, and five to twenty years for voluntary manslaughter of an unborn child. Appellant's post-sentence motions were denied.

After a unanimous panel of the Superior Court affirmed in a published opinion, *see Commonwealth v. Bullock,* 868 A.2d 516 (Pa.Super.2005), this Court granted discretionary review. *See Commonwealth v. Bullock,* 584 Pa. 705, 885 A.2d 40 (2005) (*per curiam* ). Only the judgment of sentence for voluntary manslaughter of an unborn child is at issue in this appeal.

## III.

We turn first to the question of the constitutionality of the Crimes Against the Unborn Child Act.[3] It is foundational that all legislation duly enacted by the General Assembly enjoys a strong presumption of validity, and "will only be declared void if it violates the Constitution 'clearly, palpably and plainly.' " *City of Phila. v. Commonwealth,* 575 Pa. 542, 573, 838 A.2d 566, 585 (2003) (quoting *Commonwealth, Dep't of Transp. v. McCafferty,* 563 Pa. 146, 155, 758 A.2d 1155, 1160 (2000)). The party challenging the statute's constitutionality "bears a very heavy burden to prove that it is unconstitutional," moreover, and all doubts on the question are resolved in favor of a finding of constitutionality. *Payne v. Commonwealth, Dep't of Corr.,* 582 Pa. 375, 383, 871 A.2d 795, 800 (2005). Because this is an issue of law, our scope of review is plenary and our standard of review is *de novo. See Commonwealth v. Cousin,* 585 Pa. 287, 294, 888 A.2d 710, 714 (2005).

---

**3.** As noted, a contention surrounding the jury instructions given at trial is before the Court. However, the constitutional question must be addressed because, even if Appellant were to prevail with regard to the jury instruction issue, a new trial on the fetal homicide charge could only be required if the Act is deemed constitutional.

488

## A. Vagueness

■ Appellant initially contends that the Act violates due process under the void-for-vagueness doctrine. He proffers that, absent a requirement that the fetus be viable outside the womb at the time of its death, the statute fails to provide fair warning of precisely what conduct is prohibited. Appellant reasons, in this regard, that, until a fetus is viable (in the sense that it could likely survive outside the womb),[4] it cannot actually be alive and, hence, cannot suffer death. Such failure to include a viability component, according to Appellant, permits arbitrary application and enforcement of the statute because it is impossible for a person of ordinary intelligence to understand what "death" means when applied to a non-viable fetus. *See* Brief for Appellant at 13–14.

■ The void-for-vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see Commonwealth v. Mayfield,* 574 Pa. 460, 467, 832 A.2d 418, 422 (2003). Although criminal statutes should be strictly construed in favor of lenity where there is ambiguity, their words are, nonetheless, interpreted according to the "fair import of their terms." 18 Pa.C.S. § 105; *see Commonwealth v. Booth,* 564 Pa. 228, 234 & n. 5, 766 A.2d 843, 846 & n. 5 (2001).

■ Presently, the Act prescribes that it is unlawful to intentionally, knowingly, recklessly, or negligently cause the death of an unborn child, defined to include all stages of gestation from fertilization to live birth. This definition is

4. Although the Act does not reference the concept of viability, we note that the Abortion Control Act defines viability as "[t]hat stage of fetal development when, in the judgment of the physician based on the particular facts of the case before him and in light of the most advanced medical technology and information available to him, there is a reasonable likelihood of sustained survival of the unborn child outside the body of his or her mother, with or without artificial support." 18 Pa.C.S. § 3203.

straightforward. In the first place, the concept of a fetus or unborn child as a potential victim of violence is neither obscure nor difficult to grasp. *See Booth,* 564 Pa. at 241, 766 A.2d at 850 ("Today it is understood that a mother and her unborn child are separate and distinct entities, and that medicine is generally able to prove the *corpus delicti* of the homicide of an unborn child."). It is also clear that, by defining unborn child to include all stages of gestation, *see supra* note 2, the General Assembly intended to eliminate any viability requirement. *Accord People v. Ford,* 221 Ill.App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189, 1198 (1991) (reaching same conclusion with regard to a similarly-worded definition of unborn child). Moreover, as appellate courts in other jurisdictions have elaborated in construing similar feticide enactments, the statutory language does not purport to define the concept of personhood or establish when life as a human being begins and ends; rather, it imposes criminal liability for the destruction of a human embryo or fetus that is biologically alive. *See, e.g., State v. Merrill,* 450 N.W.2d 318, 324 (Minn. 1990) ("People are free to differ or abstain on the profound philosophical and moral questions of whether an embryo is a human being, or on whether or at what stage the embryo or fetus is ensouled or acquires 'personhood.' These questions are entirely irrelevant to criminal liability under the statute."). In this context, death occurs when the embryo or fetus "ceases to have the properties of life." *Id.; see also Ford,* 163 Ill.Dec. 766, 581 N.E.2d at 1201 ("The statute only requires proof that, whatever the entity within the mother's womb is called, it had life and, because of the acts of the defendant, it no longer does."); *see also Bullock,* 868 A.2d at 522 ("Clearly, a death occurs when the embryo or fetus no longer has the capacity to thrive or grow." (citing WEBSTER'S NEW COLLEGIATE DICTIONARY 289 (8th ed.1981) (defining death as "a permanent cessation of all vital functions"))).

▇ Appellant appears to accept that the Legislature intentionally omitted any viability requirement associated with the death of an unborn child under the statute, but largely premises his vagueness claim upon an assertion that the concept of

death is difficult to understand relative to a fetus that is not viable (again, in the sense that it could likely survive outside the womb). We disagree, as we believe that the concepts of life and its cessation are readily understandable to persons of ordinary intelligence relative to biological life forms beginning at the cellular level—as noted, the concept of biological life extends to organisms that retain vital functions and the capacity to grow and thrive. Appellant offers no example of a circumstance in which an actor who causes the permanent cessation of all of the vital functions of an embryo or fetus would not conventionally understand that his conduct has caused the death of the embryo or fetus.[5] Moreover, to accept that a fetus is not biologically alive until it can survive outside of the womb would be illogical, as such a concept would define fetal life in terms that depend upon external conditions, namely, the existing state of medical technology (which, of course, tends to improve over time). See Booth, 564 Pa. at 246 n. 18, 766 A.2d at 853 n. 18 (recognizing the General Assembly's findings concerning "the steady reduction in the age of fetal viability").

Accordingly, viability outside of the womb is immaterial to the question of whether the defendant's actions have caused a cessation of the biological life of the fetus, and hence, to the question of whether the statute is vague in proscribing the killing of an unborn child. We find that individuals of ordinary intelligence are readily capable of discerning the conduct prohibited by the Act, and we fail to perceive anything in the legislation giving rise to a substantial concern that it may be discriminatorily enforced.

5. Appellant does argue that the statute leaves room for speculation in unusual cases in which, for example, brain activity in a developed fetus may have ceased but other vital functions remain. See Brief for Appellant at 14. It is well settled, however, that, outside the First Amendment context, vagueness challenges are examined in light of the facts of the case at hand, rather than abstract, hypothetical scenarios. See Commonwealth v. Heinbaugh, 467 Pa. 1, 5, 354 A.2d 244, 245 (1976) (quoting United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975)). If a defendant's conduct was clearly prohibited by the challenged statute, he will have received fair warning even though there may be doubts about the statute's applicability in other situations.

## B. Substantive Due Process

Appellant also maintains that the statute is "unconstitutionally broad" for similar reasons, *i.e.,* because it fails to "distinguish between viable or living organisms and nonviable or nonliving organisms." Brief for Appellant at 15. He contends that the statute's allegedly unnecessary breadth is fatal to its validity because it affects his fundamental liberty interest in remaining free from confinement, and thus, must be justified by a compelling state interest. In this respect, he notes that the United States Supreme Court has determined that a State's interest in fetal life only becomes "compelling" at viability, *see Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973), a property that he alleges the unborn victim in the present case lacked.

We interpret this claim as sounding in substantive due process, as opposed to overbreadth, both because it appears in Appellant's brief under a general due process heading, *see* Brief for Appellant at 12, and because overbreadth claims only pertain in a First Amendment context. *See City of Chicago v. Morales,* 527 U.S. 41, 79, 119 S.Ct. 1849, 1870, 144 L.Ed.2d 67 (1999) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987))). Under the doctrine of substantive due process, the United States Supreme Court has recognized that the Fourteenth Amendment's Due Process Clause, *see* U.S. CONST. amend. IV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"), guarantees more than fair process and the absence of physical restraint, but "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg,* 521 U.S. 702, 719–20, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997).

Appellant characterizes the liberty interest affected by the Crimes Against the Unborn Child Act as his fundamental right to remain free from confinement; however, complying

with the Act would not result in confinement. Moreover, Appellant does not reference any authority for the position that he has a right to unilaterally kill the unborn child carried by another person. To the contrary, the United States Supreme Court has affirmed that states have an "important and legitimate interest" in protecting fetal life at all stages, even if that interest only becomes "compelling" at viability. *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973); *see Planned Parenthood v. Casey,* 505 U.S. 833, 846, 112 S.Ct. 2791, 2804, 120 L.Ed.2d 674 (1992) (reaffirming that one of *Roe's* essential holdings was that "the State has legitimate interests from the outset of the pregnancy in protecting ... the life of the fetus ...."); *see also Bullock,* 868 A.2d at 522–24 (discussing cases); *accord People v. Davis,* 7 Cal.4th 797, 30 Cal.Rptr.2d 50, 872 P.2d 591, 597 (1994) (observing that *Roe* "does not hold that the state has no legitimate interest in protecting the fetus until viability"); *State v. Merrill,* 450 N.W.2d 318, 322 (Minn.1990) (noting that the state's interest in protecting "the potentiality of human life" includes protection of the unborn child, "whether an embryo or a nonviable or viable fetus"); *State v. Alfieri,* 132 Ohio App.3d 69, 724 N.E.2d 477, 482 (1998) (explaining that, even under *Roe,* "there has never been any notion that a third party ... has a fundamental liberty interest in terminating another's pregnancy"); *People v. Ford,* 221 Ill.App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189, 1199 (1991). Therefore, as Appellant has failed to identify any fundamental right infringed by the statute, his substantive due process claim fails.

## C. Equal Protection

▮▮▮ Appellant next urges us to find that the statute violates the Equal Protection Clause. *See* U.S. CONST. amend. IV, § 1 ("nor shall any State ... deny to any person within its jurisdiction the equal protection of the laws"). He proffers that natural fathers who kill their unborn children are similarly situated to pregnant mothers who kill the fetus they are carrying. In forwarding this argument, Appellant again maintains that fundamental rights are in issue, this time not only his right to remain free from confinement, but his "liberty

interest to father children and in the growth and development of the fetus." Brief for Appellant at 17. Thus, he posits, "[t]he fact of pregnancy alone, encompassed within a mother's privacy right, is not a compelling reason for the state to excuse a mother who perpetrates a crime against her own unborn child, yet hold the natural father criminally responsible . . . ." *Id.*

 While the Equal Protection Clause assures that all similarly situated persons are treated alike, it does not obligate the government to treat all persons identically. *See Small v. Horn*, 554 Pa. 600, 615, 722 A.2d 664, 672 (1998) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). Thus, the Clause does not prevent state legislatures from drawing classifications, so long as they are reasonable. *See generally Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 136, 828 A.2d 1079, 1088 (2003) (affirming that equal protection precepts "do not vitiate the Legislature's power to classify, which necessarily flows from its general power to enact regulations for the health, safety, and welfare of the community"). In determining constitutional reasonableness, this Court first ascertains the appropriate level of judicial scrutiny to apply, which in turn depends upon the type of categorization involved and the nature of the right affected. Where the challenged governmental action does not burden "fundamental" or "important" rights, and does not make a suspect or quasi-suspect classification, it is subject to rational-basis review. *Small*, 554 Pa. at 615, 722 A.2d at 672 (citing *McCusker v. Workmen's Comp. Appeal Bd. (Rushton Mining Co.)*, 536 Pa. 380, 385, 639 A.2d 776, 778 (1994)). *See generally Commonwealth v. Bell*, 512 Pa. 334, 344–45, 516 A.2d 1172, 1178 (1986) (summarizing the three levels of scrutiny in Pennsylvania law). Suspect classes are race and national origin, and for purposes of state law, alienage; quasi-suspect classifications are gender and legitimacy. *See Small*, 554 Pa. at 615 nn. 14–15, 722 A.2d at 672 nn. 14–15.[6]

---

6. This Court has sometimes used the term "sensitive classification" when referring to quasi-suspect classifications. *See id.*

Presently, the challenged distinction consists of the mother versus everyone else. *See* 18 Pa.C.S. § 2608(a)(3) (exempting the pregnant woman in regard to crimes against her own unborn child). This classification is neither suspect nor quasi-suspect,[7] and the primary asserted right involved, *i.e.*, the "right" to unilaterally kill the unborn child that another person is carrying, is neither fundamental nor important—indeed, it does not exist. Nor is any right of fathers to produce children and promote their development adversely affected by the Act; rather, the statute is plainly aimed at protecting fetal growth and development from unlawful interference. Hence, to survive judicial scrutiny, the present classification need only satisfy the rational basis standard.

Under rational basis review, a classification will be upheld so long as it bears a reasonable relationship to a legitimate state purpose. *See Harrisburg Sch. Dist. v. Zogby*, 574 Pa. 121, 136, 828 A.2d 1079, 1088 (2003). Specifically, "the classification, though discriminatory, will be deemed reasonable if any state of facts reasonably can be conceived to sustain it." *Id.* at 137, 828 A.2d at 1089. In undertaking this analysis, courts are free to hypothesize grounds the Legislature might have had for the classification. *See id.* at 137–38, 828 A.2d at 1089 (citing *Baltimore & Ohio R.R. Co. v. Commonwealth, Dep't of Labor & Indus.*, 461 Pa. 68, 84, 334 A.2d 636, 644 (1975); *Geary v. Retirement Bd. of Allegheny County*, 426 Pa. 254, 259–60, 231 A.2d 743, 746 (1967)). It bears repeating that all doubts on this question, as with all questions of constitutional validity, are resolved in favor of upholding the statute.

In our view, the General Assembly had a legitimate basis for distinguishing between the mother and everyone else. Simply put, the mother is not similarly situated to everyone else, as she alone is carrying the unborn child. Under prevailing jurisprudence of the United States Supreme Court, the fact of her pregnancy gives her (and only her) certain liberty

---

7. Notably, this is not a gender classification, as male and female perpetrators (other than the mother) are treated identically under the Act.

interests in relation to the termination of that pregnancy that the Legislature could reasonably have sought to avoid infringing by exempting her from criminal liability under this particular statute. *Cf. Witters v. State Comm'n for the Blind,* 112 Wash.2d 363, 771 P.2d 1119, 1123 (1989) (rejecting an equal protection challenge where the classification at issue served the Legislature's interest in complying with constitutional requirements). Although the Act contains a separate exemption for voluntary abortion, *see* 18 Pa.C.S. § 2608(a)(1), because of the mother's unique connection to the fetus there are various situations even outside of the abortion context (such as those pertaining to drug addiction or attempted suicide) in which she alone might bear an increased risk of criminal prosecution were it not for the (a)(3) exception. The Legislature could rationally have taken this into account and sought to place the mother on a similar footing to all other persons as respects these types of situations.[8] While this does result in the mother being treated more leniently under the Act as regards crimes against her unborn child, such a result would only be constitutionally problematic if it stemmed from an arbitrary classification, which, as noted, it does not. Accordingly, Appellant has not carried his burden of proving that the challenged distinction is "clearly, palpably, and plainly" unconstitutional.

## IV.

We now turn to Appellant's alternate claim that he should receive a new trial due to an error in the trial court's jury instructions. The court first instructed the jury concerning the possible verdicts as to the killing of Hargrave, and then as to the killing of the unborn child. In this latter portion of the charge, after delineating the elements of murder of an unborn child, including malice, the trial court instructed the jury on the offense of voluntary manslaughter of an unborn child:

8. This Court need not presently opine regarding the legal propriety of a hypothetical criminal prosecution of the mother in such circumstances. The relevant point here is that the classification is not arbitrary, but is based on the Legislature's recognition that the mother is differently situated from everyone else in relation to her unborn child.

If you do not find that the Defendant had malice ... you may find him guilty of voluntary manslaughter of the unborn child as long as you are satisfied that the following three elements have been proven beyond a reasonable doubt: first, that the unborn child is dead. Second, that the Defendant killed it. And, third, that the Defendant had the intent to kill the mother of the unborn child.

N.T. October 20, 2003, at 907. As discussed above, the applicable statutory definition of manslaughter of an unborn child clarifies that the defendant must have been

acting under a sudden and intense passion resulting from serious provocation by the mother of the unborn child whom the actor endeavors to kill, but he *negligently or accidentally causes the death of the unborn child.*

18 Pa.C.S. § 2605(a)(1) (emphasis added). Appellant states that the Act establishes a minimum *mens rea,* relative to causing fetal death, of negligence or accident, which the judge refused to define for the jury.

## A. Negligence

In the present context, the term "negligence" means criminal negligence, *see* 18 Pa.C.S. § 302, official cmt., which is defined as follows:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and intent of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(4); *see Commonwealth v. Heck,* 517 Pa. 192, 201, 535 A.2d 575, 580 (1987); *Commonwealth v. Ketterer,* 725 A.2d 801, 806–07 (Pa.Super.1999). This is a higher level of negligence than ordinary tort negligence. *See Commonwealth v. Huggins,* 575 Pa. 395, 404, 836 A.2d 862, 867 (2003).

 Appellant argues that the judge's failure to define criminal negligence allowed the jury to convict on the basis of ordinary negligence. The Commonwealth counters that the charge must be read as a whole, and that the judge had previously defined gross negligence. Therefore, according to the Commonwealth, the judge's overall instructions accurately reflected the law. *See* Brief for Appellee at 19. While the judge did define gross negligence, *see* N.T. October 20, 2003 at 895, this definition was provided as part of the charge on the homicide of the mother, and not the unborn child. The Commonwealth's suggestion that the jury must have understood the same definition to apply to mere negligence, a distinct term recited as an element of a different offense, is not well taken. We find that the trial court erred in refusing Appellant's request that it define criminal negligence for purposes of the offense of voluntary manslaughter of an unborn child. *See Commonwealth v. Safrit,* 517 Pa. 484, 485, 538 A.2d 1335, 1335 (1988) (*per curiam* ) (noting the necessity of a charge on the applicable *mens rea* requirement); *see also Commonwealth v. Mason,* 474 Pa. 308, 311, 378 A.2d 807, 808 (1977) ("The trial court's refusal to charge the jury concerning the element of intent necessary to convict of voluntary manslaughter was error.").

 This raises the question of whether the error was harmless. The Superior Court deemed the error harmless by observing that the evidence adduced at trial was sufficient to support a finding of criminal negligence. *See Bullock,* 868 A.2d at 526. Evidentiary sufficiency, however, is not the correct standard where the trial court errs. Rather, under the harmless error doctrine, the judgment of sentence will be affirmed in spite of the error only where the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict. *See Commonwealth v. Samuels,* 566 Pa. 109, 112–13, 778 A.2d 638, 641 (2001).

 Upon review under this standard, we conclude that the trial court's error in failing to define "negligently" was harmless. The jury received the charge set forth above and

ultimately convicted Appellant of voluntary manslaughter of an unborn child. One of the elements that the trial judge recited for this offense was that Appellant must have "had the intent to kill" the mother. Thus, pursuant to the instructions—which the jury is presumed to have followed, *see Commonwealth v. Williams*, 581 Pa. 57, 78, 863 A.2d 505, 517 (2004)—the guilty verdict for manslaughter of an unborn child subsumed a specific finding by the jury that Appellant intended to kill Hargrave.[9] Further, it is undisputed that Appellant was aware of Hargrave's pregnancy, and that the jury knew of this awareness on Appellant's part.[10] Any failure on Appellant's part to perceive that killing Hargrave would also result in the death of her unborn child, considering the nature and intent of his conduct and the circumstances known to him, would plainly "involve[ ] a gross deviation from the standard of care that a reasonable person would observe in [Appellant's] situation." Thus, as the degree of culpability actually found by the jury was at least criminal negligence with respect to the unborn child, the court's failure to define this term could not have contributed to the verdict.

## B. Accident

■ As part of this claim, Appellant also takes issue with the trial court's "failure to instruct on the *mens rea* component of 'accidentally.'" Brief for Appellant at 10; *see* N.T. October 20, 2003, at 911 (reflecting the judge's decision to allow the jury to rely on the "common or ordinary" meaning of the term). Preliminarily, we find doubtful Appellant's sugges-

9. Any inconsistency between this finding and the jury's failure to convict Appellant of first-degree murder of Hargrave is of no moment. *See generally Commonwealth v. Magliocco*, 584 Pa. 244, 266, 883 A.2d 479, 492 (2005) ("[A] mere facial inconsistency in verdicts is not a valid basis upon which to upset a conviction which is otherwise proper, since consistency in verdicts is not required.").

10. For example, in his signed statement to the police—which was shown and read to the jury, *see* N.T. October 20, 2003, at 83, 85— Appellant indicates: "She [Hargrave], being 6 months pregnant, I asked her to slow down [in her use of drugs]." The officer who took the statement also provided uncontested testimony that, upon turning himself in to the police, Appellant orally admitted he knew Hargrave was pregnant. *See id.* at 73.

tion that "accidentally" is a *mens rea*, or guilty mental state. Rather, it is a term of common usage that, in the present context, signifies the lack of any purpose or intention to kill the unborn child. For example, as the Superior Court observed, "the death of an unborn child could be considered 'accidental' if the perpetrator was not aware the mother was pregnant. . . ." *See Bullock*, 868 A.2d at 526. In this respect, the offense as described under Section 2605(a)(1) embodies the concept of transferred intent, similar to that reflected in the traditional manslaughter offense when the actor "negligently or accidentally" kills someone other the individual whom "the actor endeavors to kill." 18 Pa.C.S. § 2503(a)(2).[11] Appellant does not reference any authority for the position that "accidentally" must be defined by the trial court, and we are unaware of any; indeed, the jury would appear capable of applying a common-sense meaning to the term. *Cf. Commonwealth v. Lambert*, 529 Pa. 320, 339, 603 A.2d 568, 577 (1992) (indicating that the term, "knowingly created a grave risk of death to others," need not be defined by the trial court, as the jury was able to apply a common-sense meaning).[12] Finally, as we have already determined that the evidence was uncontested that Appellant was criminally negligent in the killing of

11. *See generally Commonwealth ex rel. McCant v. Rundle*, 418 Pa. 394, 396, 211 A.2d 460, 462 (1965) (describing the transferred intent rule); *State v. Brady*, 393 Md. 502, 903 A.2d 870, 875–78 (2006); *In re T.K.*, 109 Ohio St.3d 512, 849 N.E.2d 286, 289 (2006) ("[U]nder the doctrine of transferred intent, an offender who intentionally acts to harm someone but ends up accidentally harming another is criminally liable as if the offender had intended to harm the actual victim."); *State v. Horne*, 282 S.C. 444, 319 S.E.2d 703, 704 (1984) (explaining the operation of transferred intent in a common-law fetal homicide scenario).

12. We note that the Act's general definition of criminal homicide of an unborn child indicates that that the offense includes the *mens reas* of intentionally, knowingly, recklessly, and negligently, *see* 18 Pa.C.S. § 2603(a), whereas the specific definition of voluntary manslaughter of an unborn child clarifies that an accidental cause of death suffices so long as the actor endeavored to kill the mother. *See id.*, § 2605(a)(1). There is no conflict between these two provisions, however, because Section 2603 does not preclude liability where the death of the unborn child is accidental. Furthermore, even if a conflict were deemed to exist, the particular definition of voluntary manslaughter would control. *See* 1 Pa.C.S. § 1933 (providing that, in statutory construction, specific provisions prevail over general ones where a conflict exists).

the unborn victim, whether or not the jury had an incorrect understanding of the term "accidentally" is inconsequential.

## V.

For the reasons stated, the judgment of sentence for voluntary manslaughter of an unborn child is affirmed.

Chief Justice CAPPY, Justice CASTILLE, Justice NEWMAN, Justice EAKIN and Justice BALDWIN join the opinion.

Justice BAER files a concurring opinion.

Justice BAER, concurring.

I join the decision of the Majority in full. I write separately only to emphasize certain matters implicit in our decision which I believe are of particular importance and, thus, are worth reiteration.

As the Majority correctly observes, the United States Supreme Court, through *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and its progeny, has clearly concluded that states have an important and legitimate interest in protecting fetal gestation from the outset of a pregnancy through the birth of a child. *See generally* Maj. at 491–92, 913 A.2d at 214. The legislature was, therefore, within its prerogative in enacting the Crimes Against the Unborn Child Act (the "Act"), 18 Pa.C.S. §§ 2601–2609, in furtherance of that interest. In doing so, the legislature sought to criminalize certain acts that would result in the cessation of the gestational process. As aptly noted by the Majority, however, the legislature's effort in this regard, "does not purport to define the concept of personhood or establish when life as a human being begins and ends; rather, it imposes criminal liability for the destruction of a human embryo or fetus that is biologically alive." Maj. at 489, 913 A.2d at 212–13 (citing *State v. Merrill,* 450 N.W.2d 318, 324 (Minn.1990)) ("People are free to differ or abstain on the profound philosophical and moral questions of whether an embryo is a human being, or on whether or at

what stage the embryo or fetus is ensouled or acquires 'personhood.' *These questions are entirely irrelevant to criminal liability under the statute.*") (emphasis added).

Accordingly, I stress that, in my view, our decision today upholding the legislation in question should not, and cannot, be interpreted as an attempt in any way to define, generally, a fetus as a life-in-being or as endorsing the notion that the interruption of the reproductive process is the killing of human life. *Roe* and its progeny remain the law in this nation and any attempt, based upon the legislature's choice of language in the Act, to undermine its constitutional imperative is unavailing