**[J-57-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 102 MAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court dated April 5, 2022 |
| | : | at No. 446 MDA 2021 Affirming the |
| v. | : | Judgment of Sentence of the |
| | : | Wyoming County Court of Common |
| | : | Pleas, Criminal Division, dated |
| PHILLIP DONALD WALTERS, | : | December 10, 2020 at No. CP-66- |
| | : | CR-0000058-2019. |
| Appellant | : | |
| | : | ARGUED: October 18, 2023 |

**OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED: September 23, 2024**

In this appeal by allowance, we consider whether the trial testimony of the Commonwealth's expert, a pathologist who opined that the victim's cause of death was "strangulation by history," was offered to a reasonable degree of medical certainty, the requisite standard for admissibility of this type of expert testimony. We find that it was not, and, for reasons discussed below, conclude that Appellant Phillip Walters is entitled to a new trial.

At approximately 5:15 p.m. on December 30, 2018, Appellant called 911 to report that his girlfriend, 24-year-old Hayley Lorenzen, was missing. Lorenzen had recently moved into Appellant's apartment, which Appellant shared with his 10-year-old son. According to Appellant, the three had stayed up late the prior evening, and, when Appellant awoke, he discovered that Lorenzen was not in the apartment. Appellant indicated that, prior to calling 911, he contacted Lorenzen's father to see if he had heard

from her; when her father stated that he had not heard from her, Appellant decided to contact the police. Apparently being advised that he needed to wait 24 hours to report a person missing, Appellant contacted the police at approximately the same time on the following day, December 31, 2018. On January 1, 2019, the police met Appellant at his residence to complete a missing person report, and Appellant showed the police several of Lorenzen's belongings, such as her clothing.

On January 9, 2019, an attorney for Gabel Bell ("Bell") contacted the Wyoming County District Attorney's Office, indicating that his client had information regarding Lorenzen's death. During a subsequent interview with the Pennsylvania State Police, Bell stated that Appellant killed Lorenzen. Bell explained that she met Appellant online in September 2018, and they began a sexual relationship, typically communicating through text messages, although they also met in person. According to Bell, the relationship involved the infliction of physical pain for sexual pleasure, and dark fantasies, including the fantasy of Appellant choking and killing Bell. Bell ended the relationship in October, when Lorenzen moved in with Appellant, but resumed it after a few weeks. However, in November, Bell told Appellant that she did not want to be in a relationship with someone who was living with someone else. Appellant told her he was "working on" breaking up with Lorenzen. N.T., 10/21/20, at 13. On December 27, 2018, Bell and Appellant were texting each other about a sexual fantasy, and Appellant asked Bell to describe how she would kill Lorenzen and how they would dispose of her body; Bell claimed Appellant specifically mentioned throwing Lorenzen's body into the river. *Id.* at 17. Bell stated that, on December 29, 2018, she texted Appellant to end their relationship.

According to Bell, on the morning of December 30, 2018, Appellant sent her a series of text messages stating that he and Lorenzen had been drinking the night before, and that he had wanted to hurt her. Appellant asked Bell to stop texting and switch to

Snapchat, so that their messages would disappear after a short period of time. Appellant then sent Bell a picture of Lorenzen lying on the bathroom floor, suggesting that "she might be hurt or she might even be dead." *Id.* at 21. Appellant asked Bell to come to his home, and Bell immediately went to Appellant's apartment and observed that Lorenzen was dead. She stated that Appellant told her he attempted to choke Lorenzen and break her neck while she was asleep, but that she woke up and became upset and nauseous and went into the bathroom, and that, as Lorenzen leaned over the toilet, Appellant struck her on the back of the head with a hammer and choked her to death. Bell stated that Appellant instructed her to remove a necktie that he had tied around Lorenzen's neck and clean the apartment, and she complied. Appellant then placed plastic grocery bags around Lorenzen's hands and face, and placed her body into the trunk of his car, tying trash bags containing rocks around her body. Bell then rode with Appellant to a nearby bridge, where Appellant threw Lorenzen's body into the river. Based on the information provided by Bell, Appellant was arrested and charged with first-degree murder.[1]

On July 20, 2019, Lorenzen's remains were found in the Susquehanna River, and the Commonwealth subsequently amended the criminal information to include charges of strangulation[2] and abuse of a corpse.[3] At trial, in addition to the above-described testimony of Bell, the Commonwealth presented, *inter alia*, the testimony of the director of 911 for Wyoming County, who testified regarding the calls he received from Appellant; and the testimony of Appellant's upstairs neighbor, who testified that, while she usually saw Appellant dressed in shorts and a t-shirt, on the days following December 30, 2018, she saw him wearing long sleeves, and that Appellant texted her to see if she had seen Lorenzen. The Commonwealth also presented the testimony of several individuals,

---

[1] 18 Pa.C.S. § 2502(a).
[2] *Id.* § 2718(a)(1).
[3] *Id.* § 5510.

including a friend of Appellant and Lorenzen's father, indicating that Appellant contacted them on December 30, 2018 to see if they had heard from Lorenzen.

Various law enforcement officials testified regarding their interviews with Appellant, his son, and Bell, as well as their search of Appellant's residence. Additionally, a forensic specialist testified that he tested a red stain found in Appellant's bathtub, but that it testified negative for human blood. The forensic specialist explained that he used "Bluestar," a substance similar to luminol, to test for blood on other areas of the bathroom, and that the testing revealed luminescence on the door handle, sink, tub, floor, and some of the walls. However, the specialist conceded that Bluestar can result in false positives, particularly if there is an animal present in the area, and he acknowledged that Appellant had a dog. The forensic specialist also stated that, prior to using Bluestar, he inspected the bathroom, including the walls, sink, toilet, tub, and plumbing, and it appeared that it had "been a long time since they were cleaned." N.T., 10/22/20, at 186.

Finally, the Commonwealth presented the testimony of Dr. Gary Ross, the pathologist who conducted an autopsy of Lorenzen's body. Dr. Ross testified that, at the time Lorenzen's body was discovered, it was "in a very advanced state of decomposition"; that there "was almost complete skeletonization of the head and neck organs";[4] and that he "didn't see evidence of any overt injury on the body per se externally when [he] examined it." *Id.* at 18.

Nevertheless, Dr. Ross testified that it was his conclusion that Lorenzen "died by strangulation which was by history." *Id.* at 31. Specifically, he stated:

> [t]here was no anatomic indication that she was actually strangled. If I looked at the body alone without any history, I could not say that. It would have to be an undetermined

---

[4] "Skeletonization" is defined as extreme emaciation, or the removal of soft parts from the skeleton. *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (7th ed.).

death. . . . I had no physical actual evidence that a strangulation occurred other than the history. The history to me was very important because I saw no other possible cause of death either.

*Id.* at 31-32.

On cross-examination, Dr. Ross explained that he "determined the cause and manner of death by history and the exclusion of everything else from the autopsy." *Id.* at 48. He clarified that "somebody else's statements are the history. And that's what I refer to. And that's what I based my findings largely upon." *Id.* at 49. The statements Dr. Ross relied on were Bell's.[5] Dr. Ross reiterated that there was "no physical evidence to support" a determination that Lorenzen's death was the result of strangulation. *Id.* at 53.

The jury convicted Appellant of the aforementioned offenses, and he was sentenced to life imprisonment without parole. Appellant filed a post-sentence motion, arguing, *inter alia*, that the trial court erred in allowing Dr. Ross to offer an opinion regarding Lorenzen's cause of death because his conclusions were not rendered to a reasonable degree of medical certainty, and, in fact, were not medical conclusions at all, as they were based solely on Bell's account of the events. The trial court denied Appellant's post-sentence motion, and, in its opinion in support thereof, stated:

> Dr. Ross testified to a reasonable degree of medical certainty that Ms. Lorenzen's death was strangulation, by history. There was certainly adequate testimony from numerous other witnesses regarding the cause of Ms. Lorenzen's death and as such, the jury was able to conclude beyond a reasonable doubt that the cause of death was strangulation.

Trial Court Opinion, 3/11/21, at 7.

Appellant appealed his judgment of sentence to the Superior Court, arguing, *inter alia*, that Dr. Ross' testimony that the cause of Lorenzen's death was strangulation by history was not based on objective medical findings and was not rendered to a reasonable

---

[5] Bell's testimony was the only testimony stating that Lorenzen had been strangled.

degree of medical certainty; further, he argued that Dr. Ross' testimony improperly bolstered the credibility of Bell. The Superior Court affirmed Appellant's judgment of sentence in a unanimous, unpublished memorandum opinion. *Commonwealth v. Walters*, 2022 WL 1016624 (Pa. Super. filed Apr. 5, 2022). In rejecting Appellant's argument that Dr. Ross' opinion as to Lorenzen's cause of death was not rendered to a reasonable degree of medical certainty because it was based solely on Bell's account of the victim's death, the Superior Court posited that our precedent permits a medical examiner to rely on case history in formulating an opinion on cause of death, specifically noting that, in *Commonwealth v. Bullock*, 913 A.2d 207 (Pa. 2006), we

> wrote with apparent approval of the coroner's reliance on case history to arrive at a cause of death: "At trial, the coroner stated that [the victim's] cause of death was 'strangulation by history,' which refers to the events immediately preceding the death, […] this conclusion was apparently based, in part, upon the occurrences as related by Appellant in his statement to police."

*Walters*, 2022 WL 1016624 at *6 (quoting *Bullock*, 913 A.2d at 211) (alterations original). Thus, the Superior Court rejected Appellant's argument that, because the trial court allowed Dr. Ross "to consider Bell's account of the victim's death," his opinion as to cause of death did not meet the admissibility standard for expert testimony. *Walters*, 2022 WL 1016624 at *6.

The Superior Court also rejected Appellant's argument that Dr. Ross' testimony improperly bolstered Bell's credibility. In particular, the court noted that Dr. Ross testified that he was *unable* to determine if Lorenzen had suffered neck trauma, and, therefore, his testimony, in fact, did not corroborate Bell's claim that Lorenzen had been strangled. The court further highlighted that Dr. Ross testified that he saw no evidence that Lorenzen's bones were broken, which he would expect if, as Bell claimed, she had been dropped from a bridge, depending on the length of the drop; nor did he observe any

fractures of Lorenzen's skull, which would corroborate Bell's testimony that Lorenzen had been hit on the head with a hammer.

Appellant filed a petition for allowance of appeal with this Court, and we granted review to consider whether the trial court should have excluded Dr. Ross' expert testimony regarding Lorenzen's cause of death on the basis that it was not offered within a reasonable degree of medical certainty, and whether Dr. Ross' testimony improperly bolstered the credibility of Bell.[6]

Preliminarily, we note that the admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. *Commonwealth v. Le*, 208 A.3d 960, 970 (Pa. 2019). An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality. *Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021).

Rule 702 of our Rules of Evidence provides that expert testimony is generally admissible if: the witness has a specialized knowledge beyond that possessed by the

---

[6] Although Justice Dougherty agrees with our determination that Dr. Ross' opinion that the victim was strangled "was not offered within a reasonable degree of medical certainty and should have been excluded at trial," he indicates that he is unable to join our holding that Dr. Ross' testimony impermissibly encroached upon the jury's determination of Bell's credibility because Appellant waived this claim as he did not raise it at trial. Concurring and Dissenting Opinion (Dougherty, J.) at 2. However, as Justice Dougherty observes, the Commonwealth does not argue that Appellant waived this claim. *Id.* at 4. Further, in his brief on appeal to the Superior Court, Appellant included this specific argument in his challenge to the admission of Dr. Ross' testimony, and the Superior Court addressed this claim. Finally, in response to Appellant's petition, this Court granted review to determine whether the Superior Court erred in admitting Dr. Ross' testimony "which was devoid of any objective medical findings and did not comport with a conclusion or opinion 'within a reasonable degree of medical certainty' thereby not only improperly bolstering the credibility of Gabel Bell but depriving [Appellant] of his right to due process and a fair trial." *Commonwealth v. Walters*, 286 A.3d 710 (Pa. filed Oct. 18, 2022) (order). Accordingly, we are disinclined to *sua sponte* find this issue to be waived.

average layperson; such knowledge will help the trier of fact to understand the evidence or determine a fact in issue; and the expert's methodology is generally accepted in the relevant field. Pa.R.E. 702;[7] *see also Commonwealth v. Maconeghy*, 171 A.3d 707, 712 (Pa. 2017). An expert may not, however, opine on issues relating to the credibility of witnesses, as the determination of witness credibility is exclusively for the finder of fact. *Id.* (holding that doctor's expert opinion that a child was sexually abused, which was based solely on witness accounts and not physical findings, was inadmissible because his opinion invaded the jury's province as the sole arbiter of witness credibility).

In addition to meeting the above general requirements for expert testimony, in order for a medical opinion regarding an individual's cause of death to be considered by the trier of fact, it must be shown that the expert "entertained a reasonable degree of medical certainty for his conclusions." *Commonwealth v. Williams*, 316 A.2d 888, 891 (Pa. 1974). An expert's opinion regarding cause of death is offered within a reasonable degree of medical certainty when it is based on medical observations and conclusions. *See*, *e.g.*, *Commonwealth v. Spotz*, 756 A.2d 1139, 1160 (Pa. 2000) (as pathologist

---

[7] Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

"clearly explained the medical basis for all of his conclusions . . . it is clear that his opinions were based upon a reasonable degree of medical certainty"); *Commonwealth v. Davido*, 106 A.3d 611, 628-29 (Pa. 2014) (in holding appellant failed to demonstrate ineffectiveness of counsel based on counsel's failure to challenge pathologist's expert testimony as unreliable, we observed that pathologist's determination as to cause of death, offered within a reasonable degree of medical certainty, was based on a number of "observable factors").

Appellant maintains that Dr. Ross' expert opinion as to Lorenzen's cause of death was not offered within a reasonable degree of medical certainty, and, thus, was inadmissible, because it was not based on objective medical findings, and, further, "could not be drawn from even the process of elimination . . . due to decomposition" of Lorenzen's body. Appellant's Brief at 31. In this regard, Appellant highlights Dr. Ross' testimony that, in light of the body's advanced stage of decomposition, he was unable to detect from an external examination any signs of overt injury, such as knife or gunshot wounds, or needle marks; that he was unable to observe any signs of bleeding or trauma to the brain because it was necrotic and liquified, so much so that, although he took tissue samples, they would not have been interpretable; that, although he suspected, based on his internal examination of the body, that Lorenzen did not suffer from heart, lung, liver, or other such diseases, his findings were "questionable" due to the necrotic state of the organs; and that he was unable to observe any sign of injury to the head and neck area because they were skeletonized and the cartilage structures were missing due to decomposition. *Id.* at 32.

Appellant further emphasizes that, in explaining the basis for his opinion that Lorenzen's cause of death was "strangulation which was by history," Dr. Ross conceded:

> [t]here was no anatomic indication that she was actually strangled. If I looked at the body alone without any history, I

could not say that. It would have to be an undetermined death. . . . I had no physical actual evidence that strangulation occurred other than the history. The history to me was very important because I saw no other possible cause of death either.

N.T., 10/26/20, at 31-32.

Appellant additionally challenges the Superior Court's reliance on this Court's decision in *Bullock*. In *Bullock*, the appellant went to the police department and reported that, approximately one week earlier, he strangled his pregnant girlfriend to death and placed her body in a closet in their apartment. The appellant was charged with third-degree murder and voluntary manslaughter. At trial, the coroner testified that, based on the autopsies of the victim and her unborn child, the victim's cause of death was "strangulation by history," a conclusion that "was apparently based, in part, upon the occurrences as related by Appellant in his statement to police." 913 A.2d at 211. The appellant was found guilty but mentally ill, and was sentenced to an aggregate term of 20 to 60 years imprisonment. He appealed to the Superior Court, which affirmed. On further review, we affirmed; we did not, however, address the admissibility of the coroner's testimony. Appellant avers that *Bullock* is distinguishable from the instant case because the appellant therein admitted to strangling the victim, whereas Appellant denies harming Lorenzen; further, he notes that the admissibility of the pathologist's opinion in *Bullock* was neither raised by the appellant, nor addressed by this Court.

Instead, Appellant suggests that this case is "more akin" to the Superior Court's decision in *Commonwealth v. Passmore*, 857 A.2d 697 (Pa. Super. 2004). Appellant's Brief at 39. In *Passmore*, the appellant, charged with the kidnapping and murder of his ex-girlfriend, pled guilty to murder generally. At a subsequent degree of guilt hearing, a pathologist testified that, although she was unable to observe any evidence of traumatic injury due to the advanced decomposition of the body, she was able to eliminate various causes of death and, based on information from the crime scene, her examination of the

body, the toxicology report, and the discovery of a pillow case containing blood and saliva that matched the victim's DNA, opined that the victim's cause of death was "most likely" and "probably" asphyxia. *Passmore*, 857 A.2d at 713. The trial court convicted the appellant of second-degree murder, and he appealed to the Superior Court, challenging, *inter alia*, the weight of the evidence for his kidnapping conviction.[8] Relevant herein, the appellant argued that the trial court should not have considered the pathologist's opinion as to the victim's cause of death because it was not offered within a reasonable degree of medical certainty.

The Superior Court agreed with the appellant that the pathologist's use of the term "probably" to qualify her medical opinion directly contravened her claim that her opinion was rendered with "reasonable certainty." *Id.* (citing *Commonwealth v. Stoltzfus*, 337 A.2d 873 (Pa. 1975) (holding admission of medical expert's testimony as to cause of death was proper because expert testified emphatically and without qualification as to cause of death); *Commonwealth v. Radford*, 236 A.2d 802 (Pa. 1968) (holding medical expert's testimony as to cause of death was insufficient to establish legal causation because he stated defendant's assault on victim "probably" caused his death)). Notably, however, the court in *Passmore* determined that the admission of the pathologist's testimony was harmless error in light of the fact that the appellant admitted to killing the victim, and that the method of the victim's murder was immaterial to the appellant's conviction for second-degree murder.

Appellant also discusses at length the Iowa Supreme Court's decision in *State v. Tyler,* 867 N.W.2d 136 (Iowa 2015), wherein the court held, *inter alia*, that an expert's opinion on the cause and manner of a newborn baby's death was inadmissible because

---

[8] The appellant's conviction for second-degree murder was based on his conviction for felony kidnapping.

it was not sufficiently based on objective medical findings, but on the defendant's conflicting statements to police. The appellant in *Tyler* hid her pregnancy from her family and gave birth in a hotel room. Housekeeping staff eventually discovered the deceased newborn in a trash can. When interviewed by police, the appellant gave inconsistent statements, first stating that the baby was stillborn, and then stating that it was born alive, crying and moving, at which time she placed him in the bathtub and drowned him. At the appellant's trial, a pathologist testified that the cause of the newborn's death was drowning, and the manner of death was homicide. However, the pathologist admitted that his opinion on the cause and manner of death was based primarily, if not exclusively, on the appellant's uncorroborated statements to police, as opposed to objective medical findings. *See id.* at 164 (noting pathologist's statement that "without the witness statements, I could not have diagnosed drowning in this case"). The Iowa Supreme Court concluded that the pathologist's opinion was not sufficiently based on objective medical findings, and, further, that his testimony amounted to impermissible commentary on the appellant's credibility.

Along these lines, Appellant likewise contends that Dr. Ross' opinion improperly bolstered and vouched for the credibility of Bell. He submits that this Court has consistently prohibited such testimony on the basis that it "encroaches upon the province of the jury and improperly and unfairly enhances the credibility of the witness." Appellant's Brief at 53 (citing *Commonwealth v. Seese*, 517 A.2d 920 (Pa. 1986); *Commonwealth v. Balodis*, 747 A.2d 341 (Pa. 2000); and *Commonwealth v. Hernandez*, 615 A.2d 1337 (Pa. Super. 1992)). With respect to the Superior Court's determination that, because Dr. Ross admitted he found no objective evidence to substantiate Bell's claim that Lorenzen was strangled, his testimony did not impermissibly bolster Bell's credibility, Appellant suggests that the court overlooked the fact that Dr. Ross admitted that he relied on Bell's

statements for his opinion that Lorenzen was, in fact, strangled.  *Id.*  Thus, Appellant submits that, under this Court's decision in *Maconeghy*, Dr. Ross was precluded from offering an opinion that was based solely on information provided by Bell, rather than his objective physical findings.

In response, the Commonwealth, highlighting the liberal standard for qualification of expert witnesses, argues that the admission of Dr. Ross' testimony was proper because it was "based on both historical data as well as objective findings through autopsy and the process of elimination," which the Commonwealth suggests is "standard practice in the field of forensic pathology, and falls outside the ken of the average lay person."  Commonwealth's Brief at 13 (emphasis omitted).  The Commonwealth further submits that, on several occasions, Pennsylvania courts have approved the admission of expert testimony regarding the cause of death that was based on anecdotal history.  *Id.* at 14-15 (citing *Bullock* and *Williams)*.[9]

---

[9] In *Williams*, the appellant was charged with the first-degree murder of a wheelchair-bound woman with whom she lived.  The victim's remains were discovered in the residue of a fire.  At the appellant's trial, a medical pathologist testified that, "in his opinion based on a reasonable degree of medical certainty, death was caused by burning and asphyxiation."  316 A.2d at 891.  The pathologist stated that "he arrived at this conclusion by the absence of any other evidence of major trauma sufficient to cause death except the fire."  *Id.*  The pathologist admitted that the condition of the body "did not permit him to exclude all possible causes of death unrelated to trauma but reasoned that the attempt to conceal the body suggested a cause of death other than one of natural means."  *Id.* The trial court excluded the testimony on the basis that the pathologist "had not testified to the cause of death using the standard of reasonable doubt."  *Id.*  In the instant case, the trial court cited *Williams* in support of its denial of Appellant's post-sentence motion. The Superior Court concluded, however, that our opinion in *Williams* was *dicta*, as the trial court in that case had *excluded* the pathologist's testimony, and it further opined that *Williams* is factually distinguishable from the instant case because, in *Williams*, "there was some physical evidence to support the pathologist's conclusions," whereas, "in contrast, the only evidence of [Lorenzen's] cause of death came from Bell."  *Walters*, 2022 WL 1016624, at *6 n.7.  Notwithstanding its observations, the Superior Court, as noted above, affirmed the trial court's decision.

Additionally, the Commonwealth disputes Appellant's suggestion that Dr. Ross' testimony was qualified in a manner similar to the testimony in *Passmore*. *Id.* at 16. It further avers that *Tyler* is "inapposite," noting that the Iowa Supreme Court itself later cautioned that the factual circumstances in *Tyler* were "unique." *Id.* (citing *State v. Stendrup*, 983 N.W.2d 231, 239 (Iowa 2022)).[10] Instead, the Commonwealth suggests the instant case is more analogous to the South Carolina Supreme Court's decision in *State v. Commander*, 721 S.E.2d 413, 415 (S.C. 2011) (finding no error in the admission of a pathologist's testimony that the cause of death of a victim, whose mummified and partially decomposed body was found covered by a blanket on a sofa in her home, was asphyxiation, based on a lack of other evidence of trauma and "anecdotal history relayed by officers at the scene").

The Commonwealth further maintains that Dr. Ross' testimony did not improperly bolster or vouch for the credibility of Bell, particularly since Dr. Ross stated that he was unable to corroborate several of Bell's statements, including that Lorenzen had been struck by a hammer prior to her death, and that her body had been dropped from a great height.[11] The Commonwealth emphasizes that, "[t]he only facts Dr. Ross and [Bell] agreed upon were that [Lorenzen] had died, the manner was homicide, and the cause was strangulation." Commonwealth's Brief at 22. The Commonwealth suggests that those facts "were also evinced by the location and disposition of the body upon being

---

[10] Although the court in *Stendrup* characterized the case of *Tyler* as "unique," it expressly declined the State's request to overrule *Tyler*, and, in fact, reiterated that the pathologist's opinion in *Tyler* was inadmissible because "it was not based on objective, scientific, or medical evidence" but, rather, "solely on his belief in the mother's statements." 983 N.W.2d at 239.

[11] In light of the fact that Dr. Ross testified that, due to the decomposition of Lorenzen's body, he could not confirm whether she had been struck by a hammer, but, at the same time, opined that she had been strangled, Appellant suggests that Dr. Ross "cherry-picked his conclusion." Appellant's Brief at 35.

found, i.e., in a river tied to a bag, decomposing, with no evidence of any other cause of death discernable from the corpse." *Id.*

The Commonwealth also asserts that the cases relied on by Appellant for the proposition that expert testimony implicating the credibility of a witness is inadmissible, including *Seese*, *Balodis*, and *Hernandez*, are distinguishable because, in those cases, the expert testified that the victim of a sex crime or domestic violence crime was credible, despite the lack of physical evidence of the crime, whereas here, "Dr. Ross offered no testimony regarding the credibility of any other witnesses." *Id.* The Commonwealth further submits that *Maconeghy* is distinguishable because there was no physical evidence in that case, whereas here, "Dr. Ross was provided with a physical finding in the form of a dead body that had been found decomposing in a river with a bag tied to its arm, which is evidence independent from the statement of another witness indicating that a murder has occurred." *Id.* at 23.

Finally, the Commonwealth argues that, if this Court determines that Dr. Ross' opinion as to Lorenzen's cause of death was not offered within a reasonable degree of medical certainty, and that it improperly vouched for Bell's credibility, such error was harmless because a process of elimination of other causes of Lorenzen's death left strangulation as the only reasonable explanation. The Commonwealth further states in its brief that it "respectfully echoes the Superior Court's characterization of the evidence in the instant case as 'voluminous,'" *see id.* at 21, although it fails to identify that evidence.

As noted above, for an expert's medical opinion regarding an individual's cause of death to be admissible at trial, it must be shown that the expert's opinion was offered based on a "reasonable degree of medical certainty." *See Webb*, 296 A.2d at 737; *Williams*, 316 A.2d at 891; *Stoltzfus*, 337 A.2d at 879. Our thorough review of the record in the instant case reveals that Dr. Ross' expert opinion did not meet this standard.

At Appellant's trial, Dr. Ross testified that, at the time Lorenzen's body was discovered, it was "in a very advanced state of decomposition. It was almost complete skeletonization of the head and neck organs. The feet and the hands were absent." N.T., 10/26/20, at 18. Dr. Ross further stated: "I didn't see evidence of any overt injury on the body per se externally when I examined it. But there was more decomposition obscuring any type of injuries that may have been present." *Id.* When asked to identify several autopsy photographs of Lorenzen, Dr. Ross explained:

> The first photograph it shows the upper jaw and the base of the skull of the body . . . . And basically it shows the teeth within the jaw and almost complete skeletonization of the head and neck organs and the loss of all anterior soft tissue and boney tissue of the neck organs. That's critically important for me to find those in an autopsy because I examined those to determine if there is any signs of trauma about the neck.

> But the problem is, all that tissue rotted away over the six-month period that she was absent – or in the water. And all the soft tissue of the head and neck were gone.

*Id.* at 19-20.

Although Dr. Ross indicated that he did not observe any knife wounds, gunshot wounds, or track or needle marks on Lorenzen, he continued: "But again, the body was so decomposed that I could easily have not seen those due to the decomposition." *Id.* at 21. Dr. Ross testified that he also conducted an internal examination of the victim, but when asked to describe his findings with respect to her organs, including her heart and lungs, he stated:

> I have to preface this by saying all the internal organs like the external portions of the body were in advanced state of decomposition. So basically they were all necrotic, rotten, basically - - and I hate to say this when the body is out in the elements it basically rots and it decomposes. And all the internal organs were in that very advanced state of

decomposition. So examination of the autopsy was limited because of the decompositional changes.

*Id.* at 24. Dr. Ross reiterated throughout his testimony that his examination was "very limited" due to the decomposition of the body. *See*, *e.g.*, *id.* at 24 ("But again, my examination was very limited because of the decomposition."); *id.* at 25 ("And again, I must caution you that examination was very limited because of the decomposition changes"; "Again, [the pancreas, spleen and adrenals] were very necrotic.").

Dr. Ross further explained that he examined Lorenzen's brain and skull, and did not see any evidence of trauma to the skull or fractures, but again stated that "the brain was extremely decomposed." *Id*. at 27. In fact, he testified that, although he took a sample of Lorenzen's brain, he "[knew he] wasn't going to analyze it. And I suggested it not be analyzed because the results would basically be uninterpretable." *Id.* When asked whether he analyzed Lorenzen's musculoskeletal system, Dr. Ross stated that "[t]here were no fractures to the skeletal system. There were no injuries noted on the skeletal system of the head and neck. *And most importantly the bone structures and cartilaginous structures of the neck were absent due to decomposition.*" *Id.* at 29 (emphasis added).

Notwithstanding all of the above, when asked for a conclusion as to Lorenzen's cause of death, Dr. Ross offered the following:

> The conclusion my cause of death [sic] was that she died by strangulation which was by history. *There was no anatomic indication that she was actually strangled. If I looked at the body alone without any history, I could not say that. It would have to be an undetermined death.*
>
> What I look for in an autopsy is basically injury to the neck organs, a fractured hyoid bone which is a small bone in the neck, hemorrhage within the muscles of the neck, crushing of the larynx of the laryngeal cartilages and none of that was present because all that tissue was gone. It was all rotted away and necrotic. So all the tissue of the head and neck was absent.

I also look for petechial hemorrhages which are small blood vessels which are burst on the skin of the cheeks. But all that was gone. And I look for hemorrhages within the conjunctiva of the eyes which are typical in strangulation. But eyes were absent. The conjunctiva was absent all due to decomposition. *So I had no physical actual evidence that a strangulation occurred other than the history.* The history to me was very important because I saw no other possible cause of death either.

*Id.* at 31-32 (emphasis added).

Moreover, on cross-examination, Dr. Ross confirmed that he "determined the cause and manner of death by history and the exclusion of everything else from the autopsy," *id.* at 48, and explained that "somebody else's statements are the history. And that's what I refer to. And that's what I based my findings largely upon." *Id.* at 49. Finally, Dr. Ross reiterated that there was "no physical evidence to support" a determination that Lorenzen's death was the result of strangulation. *Id.* at 53.

It is abundantly clear from Dr. Ross' own testimony that his opinion that Lorenzen's cause of death was strangulation was not offered to a reasonable degree of medical certainty. Dr. Ross' opinion was not based on any objective medical observations or findings, as he repeatedly acknowledged that he was unable discern any trauma to Lorenzen's neck because the tissue, cartilage, and organs in her neck and head were missing. Dr. Ross also explained that he was unable to determine whether there were other potential causes of death, such as knife or gunshot wounds, or drugs, because he "could easily have not seen those due to the decomposition." *Id.* at 21. Thus, the Commonwealth's contention that Dr. Ross' opinion as to Lorenzen's cause of death was properly admitted because it was "based on both historical data *as well as objective findings through autopsy and the process of elimination,*" Commonwealth's Brief at 13 (original emphasis omitted, italics added), is unsupported. Dr. Ross repeatedly conceded

that there was *no* physical evidence to support his conclusion that Lorenzen was strangled, and that the only basis for his opinion in this regard were Bell's statements.[12]

Moreover, with respect to the Superior Court's reliance on this Court's decision in *Bullock* for the proposition that a medical expert is permitted to consider the case history in arriving at a cause of death, we agree with Appellant that *Bullock* is inapplicable to the instant case. First, the appellant in *Bullock* admitted to strangling the victim, whereas Appellant denies harming Lorenzen. Most critically, as noted by Appellant, the admissibility of the pathologist's opinion in *Bullock* was neither raised by the appellant therein, nor addressed by this Court.

We need not decide in this case the extent to which an expert may rely on case history in formulating his or her opinion as to cause of death, because it is clear that an expert's opinion cannot be based *solely* on case history; rather, it must also be supported by objective medical findings. As Dr. Ross' testimony regarding Lorenzen's cause of death was not based on *any* objective medical findings, it did not meet the standard for admissibility, and should not have been admitted at trial. [13]

---

[12] Justice Mundy asserts that we are "turn[ing] a blind eye" to "the defense's deficient attempt at issue preservation," specifically, a *Frye* challenge to Dr. Ross' methodology, in favor of resolving the issue of "whether a medical expert can issue an opinion to a reasonable degree of medical certainty based solely on case history." Dissenting Opinion (Mundy, J.) at 1. However, for the reasons aptly explained by Justice Wecht in his concurring opinion, Appellant is not challenging the admission of Dr. Ross' testimony based on *Frye*, and, as such, there is no issue of waiver. *See* Concurring Opinion (Wecht, J.) at 6 n.15.

[13] In her dissenting opinion, Justice Mundy states that Dr. Ross "testified that based on his independent examination and understanding of the case's history, he could determine to a reasonable degree of medical certainty that Lorenzen's cause of death was strangulation by history." Dissenting Opinion (Mundy, J., dissenting) at 6. Justice Mundy further submits that Dr. Ross' testimony was proper under Pa.R.E. 702, which permits expert opinion testimony if, *inter alia*, the expert's methodology is generally accepted in the relevant field, because Dr. Ross indicated that "it is 'common' in his 'practice to utilize information provided *by the police* in reaching [his] conclusions[.] . . . In fact, the (continued…)

We now turn to the question of whether Dr. Ross' erroneously admitted testimony improperly bolstered Bell's credibility. As noted above, in *Maconeghy*, this Court held that an expert's opinion that a child victim was sexually assaulted, which was based on the expert's apparent acceptance of the child's report of the abuse and not on any physical evidence of abuse, impermissibly invaded the province of the jury in determining the child's credibility. Similarly, in *Tyler*, the Iowa Supreme Court held that a pathologist's opinion regarding a newborn baby's cause of death, which was not based on objective medical findings, but, rather, on the defendant's conflicting statements to police, constituted improper commentary on the defendant's credibility. Like the testimony in *Maconeghy* and *Tyler*, Dr. Ross' opinion as to Lorenzen's cause of death was not based on any objective medical findings, but, instead, was premised on his acceptance of Bell's

___

pathologist confirmed that he has consulted the relevant history to render an opinion on cause of death in other cases." *Id.* at 7 (emphasis added).

Notably, in the instant case, the information "utilized" by Dr. Ross to reach his conclusion was not provided by the police. Rather, his opinion was based solely on the statements of Bell, who offered that she assisted Appellant in cleaning up after the murder and disposing of the victim's body. Moreover, *in addition* to meeting the requirements of Rule 702, including that the expert's methodology is generally accepted in the relevant field, for an expert's medical opinion regarding an individual's cause of death to be admissible at trial, the expert's opinion must be offered to *a reasonable degree of medical certainty. See Webb*, 296 A.2d at 737; *Williams*, 316 A.2d at 891; *Stoltzfus*, 337 A.2d at 879. An expert's opinion regarding cause of death is offered within a reasonable degree of medical certainty when it is based on *medical observations and conclusion*s. *Spotz*, 756 A.3d at 1160. As detailed above, Dr. Ross' testimony was not based on *any objective medical observations or findings*, and Dr. Ross repeatedly admitted that there was *no physical evidence* to support his conclusion that Lorenzen was strangled; rather, the *only* basis for his opinion in this regard were Bell's statements. Accordingly, the totality of Dr Ross' testimony demonstrates that his opinion as to Lorenzen's cause of death was not offered within a reasonable degree of medical certainty, notwithstanding his single affirmative reply when asked by the prosecution at the conclusion of his direct testimony whether the "conclusions [he] made today [are] within a reasonable degree of medical certainty." N.T., 10/26/20, at 36.

statements.[14] Thus, we hold that his testimony impermissibly encroached on the jury's determination of Bell's credibility.

Although the Superior Court opined that Dr. Ross' testimony did not improperly bolster Bell's credibility because he *conceded* that he was unable to determine if Lorenzen had suffered neck trauma, and, therefore, his testimony did not corroborate Bell's testimony that Lorenzen had been strangled, as Appellant emphasizes, this reasoning ignores the fact that Dr. Ross testified that, without relying on Bell's statements, he could not have offered an opinion as to Lorenzen's cause of death. Indeed, in opining that Lorenzen's cause of death was "strangulation . . . by history," Dr. Ross testified that, without Bell's testimony, he would have ruled Lorenzen's cause of death "undetermined." *Id.* at 31. He admitted that he had "no physical actual evidence that a strangulation occurred other than the history." *Id.* at 32. He explained that he "based [his] findings largely upon" Bell's statements. *Id.* at 49. Indeed, he conceded there was "no physical evidence to support" a determination that Lorenzen's death was the result of strangulation. *Id.* at 53. In repeatedly stating that that he relied on Bell's testimony to reach his determination as to Lorenzen's cause of death, and that he could not have reached his determination without her statement, Dr. Ross indisputably placed his imprimatur on Bell's testimony.

Further, while the Superior Court reasoned, and the Commonwealth argues, that, because Dr. Ross stated that he could not corroborate several of Bell's specific statements (for example, being hit on the back of the head with a hammer) based on his

---

[14] The Commonwealth attempts to distinguish these cases, suggesting that, in *Maconeghy*, there was no physical evidence, whereas in the instant case, there was physical evidence in the form of Lorenzen's dead body. However, as we discuss *infra*, while the existence of Lorenzen's decomposed body may have supported Dr. Ross' determination that the manner of death was homicide, it did not establish that she was strangled. While the Commonwealth submits that *Tyler* is inapposite, it offers no argument as to why it is distinguishable from the instant case.

examination of Lorenzen's body, his testimony did not bolster her credibility, the record testimony undermines this reasoning. For example, when asked by the prosecutor if it was "fair to say that there's no medical evidence that anyone applied a hammer to the skull" of Lorenzen, Dr. Ross replied, "there's no physical evidence to support that fact"; critically, however, he continued: "I'm not saying it didn't happen. And certainly, somebody could be struck with a hammer without fracturing the skull or causing bleeding within the brain." *Id.* at 51.

Additionally, the Commonwealth's assertion that Dr. Ross' conclusion that Lorenzen had been strangled was supported "by the location and disposition of the body upon being found, i.e., in a river tied to a bag, decomposing, with no evidence of any other cause of death discernable from the corpse," Commonwealth's Brief at 22, is incorrect. Although the location and disposition of Lorenzen's body may have supported Dr. Ross' determination that the manner of death was homicide, it did not, as revealed by Dr. Ross' testimony that he relied on the case history provided by Bell, establish that Lorenzen was strangled to death. Accordingly, we find that Dr. Ross' testimony improperly bolstered Bell's testimony.[15]

---

[15] Justice Dougherty disagrees with our conclusion that Dr. Ross "placed his imprimatur on Bell's testimony," noting that Appellant's counsel "disclaimed" this theory at trial by arguing, in his closing, that Bell's story "was never corroborated," and that counsel highlighted how Dr. Ross' testimony undercut Bell's testimony in several respects, for example, by stating that there was no physical evidence that Lorenzen had been strangled. Concurring and Dissenting Opinion (Dougherty, J.) at 5-6. First, in our view, counsel's assertion, in his closing argument, that Bell's testimony "was never corroborated" is distinct from a concession that Dr. Ross somehow rejected her strangulation testimony. Justice Dougherty's position essentially ascribes to Appellant's counsel an intent to abandon an objection to the admission of Dr. Ross' testimony – which was clearly and expressly preserved on the record – based on counsel's general assertion in his closing argument that Bell's testimony "was never corroborated." However, Appellant's counsel did not specifically reference Dr. Ross' testimony, and his statement that Bell's testimony "was never corroborated" arguably was directed at the lack of additional physical evidence and/or fact witnesses. Moreover, the Commonwealth (continued…)

Finally, we address the Commonwealth's suggestion that, if this Court determines Dr. Ross' opinion as to Lorenzen's cause of death was not offered within a reasonable degree of medical certainty, and, further, that it improperly vouched for Bell's credibility, such errors were harmless because the process of elimination of other causes of Lorenzen's death left strangulation as the only reasonable explanation. As detailed above, however, Dr. Ross testified that, due to the decomposition of the body, he was unable to determine whether there were other potential causes of death, such as knife or gunshot wounds, or drugs. N.T., 10/26/20, at 21. Thus, Dr. Ross' opinion as to Lorenzen's cause of death was not based on the process of elimination. Further, beyond its statement that it agrees with the Superior Court's characterization of the evidence as "voluminous," *see supra*, the Commonwealth makes no attempt to demonstrate that the overwhelming evidence of Appellant's guilt renders any error in the admission of Dr. Ross' testimony harmless. *See Commonwealth v. Holt*, 273 A.3d 514, 540 (Pa. 2022) (an error may be found harmless if: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming

---

did not assert, either before the Superior Court or this Court, that Appellant, through counsel's isolated statement, abandoned his claim that Dr. Ross' testimony improperly bolstered Bell's testimony. Thus, there is no basis on which to conclude Appellant abandoned his challenge to the admissibility of Dr. Ross' expert testimony. To Justice Dougherty's second point, regardless of what else in Bell's testimony Dr. Ross disputed, in specifically stating that he could not have reached a determination as to the cause of death without Bell's statement, Dr. Ross necessarily indicated to the jury that he believed her strangulation testimony, a central focus of the case. Therefore, Dr. Ross improperly bolstered Bell's testimony.

and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict).[16]

In summary, Dr. Ross' expert opinion that Lorenzen's cause of death was strangulation was inadmissible because it was not offered within a reasonable degree of medical certainty and, therefore, constituted inadmissible testimony that vouched for the credibility of Bell. As the Commonwealth failed to prove that the error was harmless beyond a reasonable doubt, we are constrained to hold that Appellant is entitled to a new trial.

Judgment of sentence vacated. Case remanded. Jurisdiction relinquished.

Justices Donohue, Wecht and Brobson join the opinion.

Justice Wecht files a concurring opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Mundy files a dissenting opinion.

---

[16] In her dissent, Justice Mundy avers that we are "summarily reject[ing]" the Commonwealth's suggestion that any error in the admission of Dr. Ross' testimony was harmless. Dissenting Opinion (Mundy, J., dissenting) at 8. She submits that, given Dr. Ross' disclosures regarding the limitations of the autopsy, "the jury was still required to assess Bell's credibility," and Bell's testimony, "[i]f believed, . . . along with other properly admitted evidence, would have been sufficient to find Appellant guilty of the charged crimes." *Id.* at 9. As noted above, and as Justice Mundy recognizes, harmless error exists if the record demonstrates that the error did not prejudice the defendant or the prejudice was *de minimis*; the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or the properly admitted and uncontradicted evidence of guilt was so overwhelming, and the prejudicial effect of the error so insignificant by comparison, that the error could not have contributed to the verdict. *See Holt*. Not only does Justice Mundy fail to identify which prong she relies on to conclude that the admission of Dr. Ross' testimony, if erroneous, was harmless error, her determination that the evidence was "sufficient" to support Appellant's conviction is not a relevant factor in a harmless error analysis. Finally, and importantly, the dissent ignores the fact that, by conceding that *he could not have reached a determination as to the cause of death without Bell's statement*, Dr. Ross placed his expert imprimatur on her testimony, and thereby necessarily and improperly bolstered her credibility.